UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
VLADIMIR JEANTY,

          Plaintiff,

       -against-

THE CITY OF NEW YORK; JUNSUN PARK, and
NICHOLAS VIRUET ,

          Defendants.
-------------------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-5344 (OEM) (JAM)

**ORELIA E. MERCHANT, United States District Judge:**

Pro se plaintiff Vladimir Jeanty's ("Plaintiff" or "Jeanty") was arrested on September 19, 2019, by defendants New York City Police Department ("NYPD") Officer ("PO") Junsun Park ("Officer Park") and Nicholas Viruet  ("Officer Viruet") (together, the "Officer Defendants").  In 2021, Plaintiff commenced this action against the Officer Defendants and the City of New York ("the City") (together with the Officer Defendants, the "Defendants") alleging federal and state law claims of false arrest against the Officer Defendants, a federal and state law malicious prosecution claim against Officer Park, a state law negligent hiring and training claim and a related *respondeat superior* "claim" against the City, and a deprivation of rights claim under NYC Administrative Code Chap. 8 Sec 8-803 against the collective Defendants.

Now before the Court are the parties' cross motions for summary judgment.  For the reasons that explained below, Plaintiff's motion is **DENIED in its entirety.**  Defendants' motion for summary judgment is resolved as follows: as to the Officer Defendants, summary judgment is **GRANTED** as to all state law claims, which are time barred; summary judgment is **GRANTED** as to the federal malicious prosecution claim and qualified immunity granted as to the false arrest

1

claim. Lastly, summary judgment is **GRANTED** as to all claims against the City.  As none of Plaintiff's claims survive, this action is **DISMISSED**.

## BACKGROUND[1]

### A.    General Background

Jeanty, a Black male, was a resident of New York State at all relevant times in this action, including at the time of his arrest on September 19, 2018.  Pl. Reply 56.1 Statement ("Pl. Reply 56.1"), ECF 62-9, ¶¶ 1-2.  Jeanty has three sons who were all below the age of 10 at the time of his arrest.  Pl. Reply 56.1 ¶ 24.

Jeanty also has a daughter, NAJ.  Affidavit of Vladimir Jeanty dated June 22, 2023 ("Jeanty Aff.") ¶ 15, ECF 62-4.  NAJ is a child in common between Jeanty and a former romantic partner, Una Sanders ("Sanders"); neither parent has sole legal nor physical custody of NAJ.  NAJ has been subject to a custody dispute that has resulted in a family court order delineating the terms of Jeanty's visitation with NAJ (the "Family Court Order").  *See* Defs' Reply 56.1 ¶ 6; Pl. Reply 56.1 ¶ 22; Jeanty Aff. ¶¶ 17-18.  The Family Court Order, dated August 30 2018, specifically provides that Jeanty

> shall have unsupervised visits with his daughter, [NAJ], at least twice per week for up to twelve (12) hours between the hours of 8:00 AM and 9:00 p.m., the days and times to be arranged by the parents.

Ex. D to Jeanty Decl., Family Court Order, ECF 61-12.

---

[1] The following facts are taken from the parties' respective Local Rule 56.1 reply statements which contain both the initial 56.1 statements of fact, the counterparty's responses thereto, and the moving party's reply.  All facts herein are undisputed unless otherwise noted.  *See* Defendants Reply to Plaintiff's Responses to Defendants' Local Rule 56.1 ("Defs' Reply 56.1"), ECF 61-8; Jeanty's Reply to Defendants' Counterstatement to Plaintiff's 56.1 Statement ("Pl. Reply 56.1 "), ECF 62-9.

**B.     July 2018 Incident**

On July 3, 2018, Sanders filed a Domestic Incident Report ("DIR") with the NYPD relating to an altercation between Sanders and Jeanty the previous evening on July 2, 2018, at approximately 10:00 p.m. (the "July 2018 Incident").  *See* Ex. K to Jeanty Decl., July 2018 DIR, ECF 61-19.

According to the reporting officer, PO Acevedo:

[Sanders] did engage in a verbal dispute with [Jeanty]. [Sanders] states that following the disputes [Jeanty] did pull her hair causing her to fear for her safety while yelling at her. [Sanders] states that her phone fell and was damages as a result of the confrontation with [Jeanty].

*Id.*

PO Acevedo reported that the first words the victim said to him were "He broke my phone."  *Id.*   PO Acevedo marked the following boxes provided on the DIR: photos were taken, property was destroyed ("cell phone"); offenses of "crim mis" and "harassment" were committed; and no arrest was made as suspect was "off scene."  *Id.*

In the box designated "Supporting Deposition" is Sanders' handwritten statement dated July 3, 2018, stating that Jeanty "grab[bed] my hair and grab[bed] my phone and drop it."  *Id.*

The July 2018 DIR generated a criminal complaint number, "Omniform Criminal Complaint #2018-073-006492," and was also assigned a NYPD case number: 2018-3131. Def's Reply 56.1 ¶ 16; *See* Color Version of Omniform Criminal Complaint #2018-073-00649 ("July 2018 Complaint"), Ex. 12 to Jeanty Decl., ECF 62-22;

The July 2018 Complaint, as transcribed into the NYPD's Omniform system, states that the offense conduct committed by Jeanty on July 2, 2018, was "CRIMINAL MISCHIEF 4" and that a DIR was required.  *See* July 2018 Complaint.

The "Narrative" portion typed into the July 2018 Complaint states that in relevant part:

C/V [Complaining Victim] STATES THAT AT T/P/O, PERP DID RECKLESSLY CAUSE HER PHONE TO BE DAMAGED BY DROPPING IT, CAUSING LESS THAN $250 IN DAMAGES. C/V FURTHER STATES PERP DID PULL HER HAIR AND CURSED AT HER, CAUSING C/V TO BE ANNOYED, ALARMED, AND FEAR FOR HER SAFETY. . . D/V PHOTOS UPLOADED . . .NO INJURIES.

*Id.*

Subsequently, NYPD officers continued investigating the allegations in the July 2018 Complaint against Jeanty by, *inter alia*: uploading pictures of Sanders' broken phone; conducting an unsuccessful home visit to Sanders' residence on July 27, 2018; talking with Sanders via phone that same day and reporting she wanted to press charges; and attempting to contact Jeanty on August 1, 2018.  *See* NYPD ECMS Index Sheet for July 2018 Complaint ("ECMS Index Sheet"), Jeanty Decl., Ex. 11, ECF 62-21.

**C.    The September 19, 2018 Arrest**

**1.    Jeanty's Arrival at 230 Lott Ave**

Sanders resides in apartment 1I at 230 Lott Avenue, Brooklyn, New Yok ("230 Lott Ave"). Jeanty Aff. ¶ 14

On September 19, 2018, around or just before 6:00 p.m., Jeanty, along with his three sons, arrived at 230 Lott Ave, passed through an unlocked gate, and waited outside in the open courtyard located in the back of the apartment complex.  Jeanty Aff. ¶ 19; December 2, 2022, Deposition of Vladimir Jeanty ("Jeanty Depo") 44:1-46:20, ECF 61-11.

Sanders and NAJ were not present at 230 Lott Ave at the time of Jeanty's arrival.  Jeanty Depo 45:24-46:1.  Jeanty's purported purpose for going to Sanders' apartment was to attempt to arrange visitation with NAJ after Sanders had repeatedly ignored his calls and attempts to arrange visitation.  Jeanty Aff. ¶ 26; Jeanty Depo 47:21-22.  Prior to Sanders' arrival, Jeanty entered 230

Lott Ave and knocked on Sanders' apartment door; receiving no response, he continued to call and text Sanders, who did not respond. Jeanty Depo 45:10-46:1.

### 2. Sanders Returns to 230 Lott Ave, Interacts with Jeanty, and Calls 911

At approximately 6:00 p.m., Sanders and NAJ returned to 230 Lott Ave where they encountered Jeanty and his sons in the courtyard. Defs' Reply 56.1 ¶ 20. According to Jeanty, he announced himself to Sanders, calling out to her while still in the courtyard, saying he was there to pick up NAJ; Sanders ignored him, and told Jeanty to leave her alone and that she was not bothering him. Jeanty Aff. ¶¶ 21-22; Defs' Reply 56.1 ¶ 8; Jeanty Depo 45:17-48:24

Jeanty entered Sanders' apartment building after her; knocking on Sanders' door again, he received no response. Defs' Reply 56.1 ¶ 10. Jeanty does not dispute that he had not made prior arrangements with Sanders to visit NAJ the day of September 19, 2018. *Id.* ¶ 7.

Jeanty then called the non-emergency number for the 73rd Precinct and requested assistance to 230 Lott Avenue. Jeanty Aff. ¶ 25; Jeanty Depo. 48:7-14. Separately, at 6:32 p.m., unbeknownst to Jeanty at the time, Sanders also initiated a call to police via the 911 emergency number. Pl. Reply 56.1 ¶ 16; *See* NYPD Dispatcher Event Chronology of 9/18/2018 ("NYPD Dispatch Chronology"), Jeanty 56.1 Statement, Ex. 1, ECF 62-11.

At 6:34 p.m., the 911 dispatcher entered an event comment that the "FC" or "Female Caller," *i.e.*, Sanders, states that "baby father is harassing her. . . . he is not letting her get into the building." NYPD Dispatch Chronology at 1.[2] Similarly, Officer Park understood that the incident

---

[2] Contrary to Defendants' contentions found in their counterstatement of material facts, the statements contained in the NYPD Dispatch Chronology do not constitute inadmissible hearsay. See Defs' 56.1 Counterstatement ¶ 17, ECF 62-7. First, police records routinely fall into the business records or regularly kept records exception under Fed. R. Evid. 803(6) or 803(8). *See Senior v. Eihab Human Services, Inc.*, 2023 WL 7134076, at 1 (E.D.N.Y.,2023) ("[I]t is long settled that police records may be admitted as evidence under the "business record" or "public records" hearsay exceptions"). Moreover, no party disputes that Sanders was the caller to 911. Thus, her statement as relayed to the 911 dispatcher may be admissible under at least the excited utterance or present-sense-impression exception under Fed. R. Evid. 803. *See, e.g.*, *Gibbs v. Borona*, 3:16-CV-00635 (JAM), 2021 WL 4726519, at *2 (D. Conn. Oct. 11, 2021) (qualifying 911 audio under both exceptions).

he and his partner were responding to was a "harassment in progress."  Deposition of Jun Sun Park ("Park Depo.") 15:22-62:13, Jeanty Decl., Ex. 16, ECF 62-26.

### 3.  NYPD Arrival on Scene

Officer Viruet received a call from "female complainant in regard to [230 Lott Ave] in regard to a male not letting her into the apartment."  Deposition of Nicolas Viruet ("Viruet Depo") 16:7-9, Jeanty Decl., Ex 17, ECF 62-22.  At approximately 6:45 p.m., Officer Park and Officer Viruet arrived at 230 Lott Ave where they first talked to Jeanty in the hallway to Sanders' apartment. Pl. Reply 56.1 ¶¶ 18, 20.  Jeanty claims that he met the officers outside in the courtyard. *See* Jeanty Depo at 49:17-23; 60:9-10.

Officer Park was the officer in charge.  Pl. Reply 56.1 ¶ 20.  Jeanty told Officers Park and Viruet that he was there to see his daughter.  *Id.* ¶ 21.  Jeanty provided the officers with a copy of the Family Court Order, as well as his identification.  *Id.* ¶ 22; Pl. Depo 62:4-8.

Both officers concede they were made aware of the Family Court Order and the custody "battle" over NAJ by Jeanty, but the parties dispute how much the officers knew about the "severity" or circumstances underlying the custody dispute.  *See* Pl. Reply 56.1 ¶ 10.  Jeanty claims that he told the officers that Sanders regularly denied him access to NAJ, that he had a CPS Neglect Petition pending against Sanders regarding NAJ, and that Sanders would "repeatedly call the police to make false allegations against" him.  Pl. Aff.  ¶ 26.  When deposed, neither Officer Park nor Officer Viruet recalled hearing these specific statements from Jeanty.  *See* Viruet Depo 48:4-11; Park Depo 50:17-22.

The Officers Defendants, along with Jeanty and his sons, then walked to Sanders' apartment on the first floor where Officer Park then knocked on Sanders' door. Pl. Aff. ¶¶ 28-29.

At some point, Sanders opened the door and Officer Park entered Sanders' apartment while Jeanty

and his three sons remained in the hallway with Officer Viruet.   Pl. Reply 56.1 ¶¶ 25-26.

### 4.   **Officer Park Speaks with Sanders in Her Apartment**

Officer Park avers that once inside Sanders' apartment, he talked with Sanders and Sanders

told him that the "reason she why she called 911" was because Jeanty was preventing her from

going into the apartment.   Park Depo. 20:1-16.   Sanders additionally reported that she had

previously taken out a "complaint" against Jeanty and Officer Park recalls that Sanders "gave

[him] a brief description of the incident." *Id.* 40:18-23.

Officer Park spoke with Sanders and conveyed the following in a colloquy with the desk

officer at the precinct later in the evening:[3]

> Desk Officer: "You guys spoke to . . well the C/V was there, right?"
> Park: "Yeah, yeah, yeah, she was there so I took a DIR again"

Arrest Audio 00:58:50-59, Pl. 56.1 Statement, Ex. 13.[4]

Separately, the Arrest Audio also captures presumably Officer Viruet stating that "CV?

Yeah, she said he, like yeah, broke her phone."   Arrest Audio 1:07:29-39.

### 5.   **Sanders' September DIR and Officer Viruet's Report**

On September 19, 2018, Sanders filled out another DIR while at her apartment.   The DIR

was reported to and witnessed by Officer Park.   *See* Park Depo 31:6-12; DIR dated 9/19/2018

("September DIR") Ex. 5 to Pl. Decl., ECF 62-15; Defs' Reply 56.1 ¶ 2 at Reply.[5]   According to

---

[3] It is reasonable to conclude this conversation took place at the 73rd Precinct because Jeanty started the recorder at or around 7:30 p.m., the time of his arrest, and Officer Park testified he returned to the 73rd Precinct at 7:40 p.m. and the timestamp of this conversation in the audio file occurs approximately and hour in, which would put it at somewhere around 8:30 p.m.   *See* Park Depo 36:17-18.

[4] The audio file has been submitted by Jeanty to the Court along with a notarized affidavit dated July 27, 202 authenticating the recording.   *See* ECF 62-5.   "Audio recordings can be authenticated by someone with personal knowledge present during the taping, among other ways."   *Soumekh v. LD Consulting Servs., Inc.*, 18-CV-6337 (DG)(SIL), 2022 WL 20652789, at *5 (E.D.N.Y. Aug. 10, 2022) (citing Fed. R. Evid. 901(b)(1)).   The Court finds the affidavit suffices to authenticate the audio as admissible evidence.   All citations to time stamps are in "hour:minute:second" format.

[5] An identical copy of this record was produced by Defendants.   *See* ECF 61-16.

the September DIR, Sanders officially reported Jeanty's alleged harassment at approximately "1910" or 7:10 p.m.  In the narrative section, Officer Park states:

> At [time and place of occurrence] P1 [Sanders] states P2 [Jeanty] did show up to her apt complex unannounced and followed her to her apt building. P1 has no injuries.

*Id.*

The DIR also indicates that Officer Park checked the NPYD DIR repository, and that Sanders reported to Officer Park that she had a prior domestic incident with Jeanty, which was described on the DIR simply as "July 2018 Crim Mischief."  *Id.*; *see also* Defs' 56.1 Reply ¶ 19. In response to the question on the DIR form "Offence committed", the box "no" is marked.

Sanders completed the Supporting Deposition portion of the DIR stating that:

> [Jeanty] show[ed] up to my complex unannounced. An[d] he was following me thru out my complex, he wouldn't let me in my building. I was scared so I ask my neighbor to wait with me until I see the cops. I call the cops from neighbor phone. I had to sneak in my building from front building in the basement to get to my building. [Jeanty] had his three boys in my hallway to watch my door while he stay in front of my building.  From basement I had to rush to my door because the 3 boys yelled for they dad.

*Id.*

Officer Viruet  filled out a handwritten UF-61 report on or about 7:10 p.m. (marked as "1910") for the September 19, 2018, incident that corroborates these facts.  *See* Complaint Report Worksheet dated 9/19/2018 ("September UF-61"), Ex. 8 to Jeanty Decl., ECF 62-18.  The September UF-61 report indicates that the Defendant Officers received a radio call reporting harassment occurring on or around 6:15 p.m. (marked as "1815").  *Id.* His handwritten notes include that the call involved a child in common, required a DIR and that a supervising officer, Sergeant Peacock, was on scene. *Id.*  Officer Viruet wrote "At [time/place/occurrence] c/v states perp did show up to her apartment complex unannounced and followed her to her apartment building, c/v has no injuries. . . ." *Id.*  Notably, Officer

8

Viruet marked the "Case Status" box as "Closed" but did not enter to what complaint or case number this corresponded to. *Id.* Further, it is marked "No" as whether Sanders was "fearful for their safety/life" and "Yes" as to whether "prior DIRs [were] prepared for the victim. *Id.*

### 6. Investigation into Jeanty

According to Officer Park a "detective investigated the complaint" reported by Sander in July 2018 and "an I-Card was created." Defs' Reply 56.1 ¶ 14 at Response (citing Park Depo 67:10-68:3). According to Officer Park, he also saw an "open I-Card only complaint" stating "probable cause to arrest" on his NYPD-issued phone prior to Jeanty's arrest. Pl's Reply 56.1 ¶ 34 at Reply; *See also id.* ¶¶ 39, 48. Officer Park was unsure of exactly when he viewed the "open I-Card only complaint," but he stated would have seen it closer to 6:45 p.m., the time of his arrival on scene, rather than the time of Jeanty's arrest at 7:31 p.m. Park Depo 66:7-23

The existence of the I-Card is in genuine dispute. *See* Pl. Reply 56.1 ¶ 39 at Reply (contending I-card was "nonexistent"). No actual I-Card was produced in discovery despite Jeanty's request, and Officer Park testified that he did not know where the I-Card was or could be found. Park Depo 80:19-24. However, the Arrest Audio clearly captures the following colloquy between officers:

- "Yo, how come it doesn't pop up, you guys don't make it like. . ."
- "Uh if they dropped the call . . . see the thing is, it's closed to patrol . . . so that means that squad never received so that's *why there's no I-Card*."

Arrest Audio at 00:59:30-45 (emphasis added).

Further, Defendants do not contest that Jeanty was even arrested pursuant to a probable cause I-Card. *See* Pl's 56.1 Reply ¶¶ 49, 59, 68.

However, Officer Park did also testify that he had seen a version of the July 2018 Complaint "at the 73 Precinct."  Park Depo 43:5-44:10 (showing Deposition Version of July Complaint ("Depo July Compl."), ECF 62-34).

The record also establishes that at the time of Jeanty's arrest, the July 2018 Complaint had a  "Case Status" that was marked as "CLOSED" to the patrol level in the Omniform System.[6] Defendants do not dispute this, and it is corroborated by Jeanty's audio recording where putatively Officer Park is heard saying that the "61 report" is "closed to patrol." Arrest Audio 01:09:8-16; *see id.* at 00:57:48 ("Oh yea it's a closed 61"); Pl. Reply 56.1 ¶ 59.

Adding a layer of ambiguity, Officer Park often interchanged the terms "complaint" and "I-Card" in during his deposition. *See e.g.*, Park Depo 25:17-24 (Officer Park affirming that "open complaint was the I-Card"); *id.* 62:4-8 ("If it's on an open complaint, that means it was an I-Card"). Thus, it is not clear to the Court whether the complaint discussed is July 2018 Complaint itself, some other report, or the putative I-Card.

Confusion aside, Officer Park explained in his deposition that even though an open I-Card stating probable cause to arrest would have authorized him to make an arrest on its own, he went into the apartment to speak with Sanders so he could obtain "information about the open complaint" and stated that she was "supposed to brief [him] on the incident" as complainants often do.  Park Depo 69:7-16.

---

[6] Three different versions of July 2018 Complaint are proffered by the parties. Inconsistent markings and answers in each indicate that the July 2018 Complaint was updated or changed in the Omniform System or captured at different times in discovery.  For example, the version cited to by the Court is produced in color and reports Record Status: Final, Initial Arrests Made," Case Status: CLOSED . . . Clearance Code: PATROL,"  and indicates that there exists a version "0".  ECF 62-22.  However, the version of the July 2018 Complaint used by Jeanty as an exhibit during Officer Park and Viruet's depositions appears scanned in black and white and reports "Case Status: CLOSED . . . Clearance Code: PATROL" and "Record Status:  Final, No arrests" and indicates that no other versions or complaint revisions exist.  *See* Depo July Compl., ECF 62-34.   The version of July Complaint proffered by Defendants, which appears in the Follow-Up Worksheet exhibit, reports "Record Status: Final, Initial Arrests Made" and further reports the "Case Statues : CLOSED . . . Clearance Code: UNIFORM ARREST" and indicates that two Complaint Revisions exist, "0" and "1."  *See* ECF 61-20.

**7.  Jeanty's Arrest**

Between 20 to 45 minutes after entering, Officer Park exited the apartment and informed Jeanty that he was under arrest.  Pl. Reply 56.1 ¶ 30; Jeanty Aff. ¶ 38.  Officer Park again asked for Jeanty's identification.  Jeanty Reply 56.1 ¶ 28; Jeanty Aff. ¶ 39.  According to police records, Jeanty was placed under arrest at 7:31 p.m. by Officer Park.  9/19/2018 Arrest Record (Color), ECF 65-10, Ex. B to Defs' Decl.; Dispatch Chronology at 3.

At that point, multiple other NYPD officers began approaching Sanders' apartment from the main entrance.  Pl. Reply 56.1 ¶ 29.  Jeanty was not shown any complaint or I-Card at the time of his arrest.  *See* Pl. Depo 71:15-23.

At some point, Jeanty activated his "phone recorder" and recorded audio of his arrest.  Pl. Reply 56.1 ¶ 31; *see generally* Arrest Audio.

Audio captured reveals the purported purpose of Jeanty's arrest:

Officer: "Do you know why you're being arrested sir?"
Jeanty: "No"
Officer: "There's uh an old case from July . . . Did you have an incident with her a long time ago?"
Jeanty: [inaudible]
Officer: "It's not from today . . ."
Jeanty: "Can I get a copy of the complaint, or no?"
Officer: "The complaint on which you are arrested on? . .
Jeanty: [Inaudible]
Officer: "I'll tell you what it is, and then like . . . I can let you know what is and then your lawyer might be able to obtain the paperwork I'm not allowed to give you the paperwork. . . . [Jeanty inaudible] "Yeah I'll tell you what it is when we get back and I'll read up on it too . . . "

Arrest Audio 00:24.15-00:25:37

**D.   Jeanty's Prosecution**

On September 20, 2018, Officer Park swore out a criminal complaint for the Kings County District Attorney that charged Mr. Jeanty with Criminal Mischief in the Fourth Degree,

Unauthorized Use of a Vehicle in the Third Degree, Menacing in the Third Degree, and Harassment in the Second Degree.  Pl. Reply 56.1 ¶ 63; *see* Kings County Criminal Complaint ("State Court Compl."), Ex. 9 to Pl's Decl., ECF 62-19.

Jeanty was arraigned on September 20, 2018.  Pl. Reply 56.1 ¶ 69.  Jeanty was then released on his own recognizance.  Pl. Aff. ¶ 54.  A full order of protection was issued against Jeanty on September 20, 2018.  Pl. Reply 56.1 ¶ 71.  The criminal charges against Jeanty were dismissed on speedy trial grounds on December 21, 2018.  Pl. Reply 56.1 ¶ 73.

**E.    Procedural History**

On September 17, 2021, Plaintiff filed a complaint in the United States District Court for the Southern District of New York, naming multiple NYPD Police Officers and the City as defendants.  Pl. Reply 56.1 ¶ 3.  On September 20, 2021, the case was transferred to United States District Court for the Eastern District of New York.  ECF 4.

On March 17, 2022, Plaintiff filed an amended complaint, ECF 21, and then a second amended complaint on March 17, 2022.   ECF 23.  On May 9, 2022, Jeanty voluntarily dismissed all named defendants, without prejudice, except the City and defendant Officers Park and Viruet.  ECF 32.

Officer Park and the City filed a joint Answer on April 25, 2022, and Officer Viruet filed his Answer on May 13, 2022.  ECF 31, 33.

The parties filed their fully briefed cross motions for summary judgment by December 19, 2023. ECF 61 (Defendants MSJ papers); ECF 62 (Plaintiff's MSJ Papers).

## STANDARD OF REVIEW

"Summary judgment is appropriate where there is no genuine dispute as to any material fact and the record as a whole indicates that no rational factfinder could find in favor of the non-moving party." *Graves v. Finch Pruyn & Co.*, 353 F. App'x 558, 560 (2d Cir. 2009) (internal citation omitted). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quotation marks omitted). "A fact is material when it might affect the outcome of the suit under governing law." *Id.* (internal quotation marks omitted). Moreover, an issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Anderson*, 477 U.S. at 248. The nonmoving party may not, however, "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan*, 996 F.2d at 532–33 (citations and quotation marks omitted).

The standard for summary judgment remains the same when cross motions for summary judgment are being considered. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir.

2001); *Eschmann v. White Plains Crane Serv., Inc.*, 11-cv-5881, 2014 WL 1224247, at *3 (E.D.N.Y. Mar. 24, 2014).  The court must examine each party's motion independently, and "in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 115 (citation omitted).

### DISCUSSION

The parties' respective cross motions both address the same core issues: (1) whether probable cause to arrest Jeanty existed at the time of his arrest; (2) whether there was probable cause to prosecute Jeanty for each of the crimes charged in the Kings County Criminal Complaint; (3) whether qualified immunity nonetheless applies to both false arrest and malicious prosecution claims (4) whether Jeanty has any valid claim against the City.  *See generally.* Plaintiff's Memorandum in Support of Summary Judgment ("Pl Memo"), ECF 62-3; Defendants Memorandum in Support of Summary Judgment ("Defs' Memo"), ECF 61-4.  In his briefing, Plaintiff voluntarily dismisses his claim under NYC Administrative Code. Plaintiff's Memorandum in Opposition to Defendants Motion for Summary Judgement at 26-27, ECF 61-5.

### A.      State Law False Arrest and Malicious Prosecution Claims

As a threshold matter, Defendants seek to dismiss Jeanty's state law claims of false arrest and malicious prosecution as barred by the statute of limitations.  *See* Defs' Memo at 17-18. However, before addressing the merits of this argument, Defendants recognize that only Officer Viruet affirmatively raised this defense in his answer to the operative complaint.  *See* Defs.' Reply 56.1, ¶ 30.  Nonetheless, Defendants contend that Officer Viruet's raising of this affirmative defense may be imputed to the City and Officer Park.

"Notwithstanding a defendant's failure to timely plead [a] defense, a district court may still entertain affirmative defenses at the summary judgment stage in the absence of undue prejudice to

14

the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003) (citing *See Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 283 (2d Cir.2000)).

Defendants contend that because Jeanty was aware that the statute of limitations defense would be put forth by at least one defendant, he is not prejudiced here as he would have been on notice that the defense would be litigated throughout discovery and potentially summary judgment. Further, because a statute of limitations defense based on malicious prosecution and false arrest each only require information relating to two fixed dates, there was no additional burden as to discovery or delay in proceedings that could prejudice Jeanty.  Defs' Reply Memo, ECF 61-7 at 8; *see Monahan v. NYC Dep't of Corr.*, 214 F.3d 275, 278 (2d Cir. 2000).  Lastly, Defendants represent that the failure to amend their answer again did not stem from any bad faith motive but rather "inadvertent oversight."  *Id.* at n.7.  Jeanty contests that the City and Officer Park should be allowed to raise the defense and states he "will undoubtedly be prejudiced."  *See* Jeanty Opp. to Defs' MSJ, ECF 61-5 at 26.  However, Jeanty does not explain further how he has been or will be prejudiced.  While Jeanty does cite caselaw for the proposition that affirmative defenses can be considered waived, the Court is persuaded that the defense should be considered for all Defendants given the apparent lack of prejudice for the reasons so stated above.

The statute of limitations for state law false arrest or false imprisonment, an intentional tort, is one year.  *Mitchell v. Home*, 377 F. Supp. 2d 361, 377 (S.D.N.Y. 2005) (citing CPLR 215(3); *see, e.g.*, *Gallagher v. Directors Guild,* 144 A.D.2d 261, 262 (1st Dep't 1988)).  Such a claim accrues when the plaintiff, upon arraignment, is released on his own recognizance.  *Mitchell*, 377 F. Supp. 2d at 377 (citing *Molyneaux v. County of Nassau,* 16 N.Y.2d 663, 663 (N.Y. 1965)).  The statute of limitations for the tort of malicious prosecution also is one year.  *Conway v. Vill. of*

*Mount Kisco, N.Y.*, 750 F.2d 205, 212 (2d Cir. 1984) (citing CPLR § 215(3)).  Such a claim accrues when the criminal charges against him are terminated in his favor.  *See Nunez v. City of New York,* 307 A.D.2d 218, 219 (1st Dep't 2003).

Here, Jeanty's false arrest claim accrued when he was arraigned and released on his own recognizance on September 20, 2018.  Pl. Reply 56.1 ¶ 69.  Jeanty's malicious prosecution claim accrued when the criminal charges against him were dismissed on speedy trial violations grounds on December 21, 2018.  *Id.* ¶ 73.  The statute of limitations for the false arrest and malicious prosecution accordingly ran on September 20, 2019, and December 21, 2019.  Yet, Jeanty filed his first complaint in the Southern District of New York on September 17, 2021.  Jeanty's state law false arrest and malicious prosecution claims are plainly untimely, and therefore, these claims are dismissed.[7]

## B.    28 U.S.C. § 1983 Claim[8]

A "plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983."  *Id.* (citations and quotation mark omitted).

---

[7] Defendants cite to Gen. Mun. L. § 50–I in their brief which "provides that, in addition to the notice of claim requirement, a tort claim against a county must be brought within one year and ninety days after the happening of the event upon which the claim is based."  *Houghton v. Cardone*, 295 F. Supp. 2d 268, 280 (W.D.N.Y. 2003).  Thus, they assert that two state claims "ran on December 19, 2019 and March 20, 2020, respectively."  Defs Memo at 17-18.  Either way, Jeanty's claims are untimely.

[8] While Jeanty's complaint simply invokes "federal law" as the mechanism for vindicating violations of an unconstitutional seizure under the federal constitution requires invoking 28 U.S.C. § 1983. The Court construes Jeanty's federal claims to have been brought under § 1983.  *See Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) (Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes.").  "The torts of false arrest and malicious prosecution both implicate rights secured by the Fourteenth Amendment and thus give rise to a § 1983 cause of action."  *Cornett v. Brown*, 04-CV-0754(DGT)(LB), 2006 WL 845568, at *5 (E.D.N.Y. Mar. 30, 2006) (subsequent history omitted).

Here, the parties' primary dispute is whether probable cause existed to arrest Jeanty on September 19, 2018. *See* Pl's Memo at 8 ("[O]nly the [probable cause] element is in dispute and requires discussion."). So long as the undisputed facts demonstrate probable cause existed at the time of his arrest for any crime, even one not ultimately charged, Jeanty cannot maintain suit on this claim as a matter of law. *See Jaegly v. Couch*, 439 F.3d at 153-544 (2d Cir. 2006); *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012).

At the summary judgment stage, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852 (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118–19 (2d Cir. 1995)). "Even where factual disputes exist, . . . a § 1983 claim may fail if the plaintiff's version of events establishes probable cause to arrest." *Jackson ex rel. Jackson v. Suffolk County*, 87 F. Supp. 3d 386, 404 (E.D.N.Y. 2014) (quoting *Mistretta v. Prokesch*, 5 F. Supp. 2d 128, 133 (E.D.N.Y. 1998)).

### 1. Probable Cause for Warrantless Arrest

"The Supreme Court has explained that 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.'" *U.S. v. Falso*, 544 F.3d 110, 117 (quoting *Illinois v. Gates,* 462 U.S. 213, 232 (1983)); *see Jenkins v. City of New York,* 478 F.3d 76, 90 (2d Cir. 2007) ("Probable cause is evaluated on the totality of the circumstances."). "When an arrest is not made pursuant to a judicial warrant, the defendant in a false arrest case bears the burden of proving probable cause as an affirmative defense." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010) (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (N.Y. 1975)).

In the context of a warrantless arrest, "[i]n general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852. "When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before it as probable cause does not require absolute certainty." *Fabrikant*, 691 F.3d at 214; *accord Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

A probable cause analysis is an "objective rather than subjective" inquiry. *Jaegly*, 439 F.3d at 153 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Therefore, an officer's subjective intent is of no moment to the Court. "That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153.

After the Supreme Court's decision in *Devenpeck*, probable cause to arrest need not be pegged to any single offense ultimately charged "because probable cause is based on the facts warranting arrest and not the statute pursuant to which a plaintiff was charged." *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010) (citing *Devenpeck*, 543 U.S. at 153); *see Jaegly*, 439 F.3d at 153-544 (explaining that "so long as the arrest itself was supported by probable cause" it matters not "whether probable cause supported any individual charge identified by the arresting officer at the time of arrest").

## 2.  Reliance on a Complaining Witness' Statements

In determining whether probable cause exists to make an arrest, "it is well settled that probable cause can exist solely based on information from an alleged victim—such as [Sanders] here—unless circumstances raise doubt as to the person's veracity.'" *Nash v. Cnty. of Nassau*, 16-

18

CV-2148(JFB)(AYS), 2019 WL 1367159, at *5 (E.D.N.Y. Mar. 26, 2019) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 69-70 (2d Cir. 2001)) (collecting cases); *see Panetta*, 460 F.3d at 395; *accord Fabrikant*, 691 F.3d at 216; *see also Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."). "Victims, in particular, are among the most reliable informants because they can provide a first-hand non-hearsay account of the criminal activity." *Davenport v. City of New York*, 15-CV-5890, 2017 WL 4356883, at *7 (E.D.N.Y. Sept. 28, 2017).

Here, Jeanty attacks Sanders' veracity in her reporting to Officer Park, contending she has "an ax to grind" and thus Officers Park and Viruet should have met her allegations and reports of prior events with skepticism. *See* Pl. Reply Br. at 14, ECF 62-3.   But, an "arresting officer is 'not required to explore and eliminate every plausible claim of innocence before making an arrest.'" *Jaegly*, 439 F.3d at 153 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 167–68 (2d Cir. 2002)). As the Second Circuit has noted, even if "a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him." *Curley*, 268 F.3d at 70.

Moreover, the only facts Jeanty leverages to attack Sanders' veracity are his self-serving statements in his affidavit stating that he told Officer Park and Officer Viruet about his custody issues and that Sanders "would repeatedly call the police to make false allegations against" him. Jeanty Aff. ¶ 26.  Assuming such hearsay statements are admissible, Jeanty's challenge to Sanders' veracity is unpersuasive for two reasons.  First, simply being aware of a custody battle between parents is not a circumstance that translates *per se* into a reason for a reasonable officer to doubt a

complaining witness' truthfulness as to what actually happened.  "If police were obligated to discredit a victim's account of the events solely because of acrimonious history between the parties, [domestic] crimes would go virtually unprosecuted." *Romney v. Black*, 14-CV-4512(JMA)(SIL), 2017 WL 1317011, at *7 (E.D.N.Y. Mar. 31, 2017).  "[T]he fact that a victim may be entangled in a domestic dispute does not, in and of itself undermine the victim's veracity." *Id.* (quoting *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 30–31 (E.D.N.Y. 2015)); *see Nash*, 2019 WL 1367159, at *6 ("[E]ven assuming *arguendo* that officers were aware of a relationship between Donna Nash and the neighbor, there is no evidence that any such relationship undermined her veracity with respect to her sworn statement of domestic abuse.").

Second, Jeanty has not explained how the *circumstances*, *i.e.*, the facts on the ground known to Officer Park and Officer Viruet at the time, undermined Sanders' veracity beyond him telling them so.  Jeanty's briefing simply states that Sanders' "veracity was clearly questionable" and that Sanders "clearly made a false harassment complaint to keep [him] from seeing his daughter." Pl's Memo  at 14.

Jeanty relies on *Triolo v. Nassau County* to argue that Officer's Park was presented with exculpatory facts when he told them about his relationship with Sanders and her alleged false accusations against him and, thus, Defendant Officers had duty to investigate these exculpatory facts as well as to "disregard evidence that undermined" Sanders' veracity.  24 F.4th 98, 106 (2d Cir. 2022).  *Triolo* does not help Jeanty here.  In *Triolo*, the arresting officer was faced with actual and "plainly exculpatory" evidence, which included another eyewitness who was present at the scene of the altercation which resulted in the DIR that was subsequently relied on by the arresting detective.  *Id.* at 103-04, 107-07.  When the detective was called back to the residence again in response to another altercation, the eyewitness tried in vain to explain that the situation

was backward and that the complaining victims who swore the DIR used for probable cause were actually the *aggressors* in both altercations; the eyewitness even tried to show photographic exculpatory evidence to the arresting detective but "[i]nstead of asking follow up questions, [he] simply rolled his eyes again and walked away." *Id.* The Second Circuit faulted the arresting detective for not investigating further in the face of such evidence. However, the same facts are plainly not present here. Jeanty claims that "[Officer] Park was aware that the Complainant called 911 for no legitimate purpose other than to have the police assist in keeping Plaintiff away from his child." Pl. Memo at 16. But there are no facts in the record supporting this contention. Jeanty also states "Park also knew one very important and dispositive fact: Park knew from the complainant that there was a prior 'July 2018 Criminal Mischief' domestic incident." *Id.* Even so, this knowledge does not go to undermining Sanders' veracity; if anything, it corroborates the fact that Park has previously seen some sort of prior domestic violence complaint involving on Jeanty and Sanders. Lastly, the argument that "Park intended to arrest Plaintiff for this prior 'July 2018 Criminal Mischief' domestic incident" is irrelevant to the legal analysis as an officer's subjective intent plays no role in assessing the reasonableness of the arrest or probable cause. *Devenpeck*, 543 U.S. at 153.

Jeanty has provided no admissible evidence beyond his own statements that Officer Park and Officer Viruet were shown and subsequently "disregarded evidence that undermined" Sanders' veracity. *Triolo*, 24 F.4th at106. If anything, the general facts corroborate Sanders' statements to police: her initial call to 911 received by Officer Viruet claimed she was being harassed by a former male partner who was blocking her from entering her apartment. The Officer Defendants testified that when they arrived they indeed found Jeanty and his three sons not in the public courtyard but rather outside of Sanders' apartment. *See supra* Part C.3. The upshot is that

the circumstances presented to the Officer Defendants at 230 Lott Ave were that (1) Jeanty and Sanders were in an acrimonious custodial dispute and (2) Jeanty purportedly told the Officer Defendants that Sanders had previously made false accusations against him.  As explained above, the law understands and the Court finds that these circumstances "in and of [themselves]" provide no reason to discount Sanders' veracity in recounting the events of that night.  *Romney*, 2017 WL 1317011, at *7.  Put another way, it was reasonable for the Defendant Officers to rely on Sanders' statements when assessing whether they had probable cause to arrest Jeanty.

### 3. Subjective Basis for the Arrest

Much is made about the purportedly conflicting bases for Jeanty's arrest.  Defs' Reply 56.1 ¶ 2.  Defendants maintain that Jeanty was arrested as a result of his conduct on July 2, 2018, rather than anything he did on the day of September 19, 2018.  *See id.*  Jeanty argues "Plaintiff was undisputedly arrested for harassment."  Pl's Memo at 10.  Either way, the law makes clear that the subjective reason for an arrest is irrelevant because probable cause is an objective, totality-of-the-circumstances inquiry based on a reasonable officer.  *See Jaegly*, 439 F.3d at 153.

### 4. Jeanty's Motion for Summary Judgment

In order for Jeanty to succeed on summary judgment of his false arrest claim, he must establish that there is no genuine dispute as to whether probable cause existed, as probable cause is an absolute defense to false arrest.  *Weyant*, 101 F.3d at 852.  Further, the Court must "construe the facts in the light most favorable to the non-moving party [here, Defendants] and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

22

### a.  Probable Cause Based on "Open I-Card"

First, had an open probable-cause I-Card existed and been viewed by Officer Park prior to Jeanty's arrest, this would have been enough to satisfy Jeanty's warrantless arrest. *See, e.g.*, *United States v. Esters*, 21-CR-398(EK), 2022 WL 16715891, at *6 (E.D.N.Y. Nov. 4, 2022) (finding no Fourth Amendment violation for an "arrest [which] was based on an active I-Card, which was supported by probable cause); *Dowtin v. O'Neill*, 16-CV-6119(LDH)(LB), 2019 WL 7496574, at *2 (E.D.N.Y. Jan. 7, 2019) (citing *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001)) ("Any knowledge held by the officer who took that complaint is imputed to Defendant (via the I-Card) as a matter of law.").

However, both the existence and viewing of an I-Card by Officer Park is in genuine dispute. Even viewing the facts in the light most favorable to Defendants as the non-moving party, there is no evidence introduced as to the existence of an I-Card beyond Officer Park's testimony that he observed I-Card sometime before Jeanty's arrest and there are other facts controverting its existence, namely Jeanty's audio recording which captures statements that no I-Card existed for him. *Compare* Park Depo at 25:20 ("Yes, the open complaint on you was I-Card"), *with* Arrest Audio at 00:59:30-45 ("so that means that squad never received so that's *why there's no I-Card*"). Further, Defendants admit in their counterstatement of material facts that an I-Card did not exist. *See* Defs' 56.1 Counterstatement ¶¶ 49, 68.

Defendants are not entitled to finding as to probable cause based on an I-Card.

### b.  Probable Cause Based on the July 2018 Complaint

Similarly, if Officer Park had indeed viewed the July 2018 Complaint, then taking the facts and inferences in the light most favorable to the Defendants, a reasonable jury may find that Officer Park had probable cause to arrest Jeanty on criminal mischief and harassment based on reviewing

the allegations in the July 2018 Complaint pursuant to the "collective knowledge doctrine"[9] prior to arresting him.[10]

However, Officer Park's recollection to viewing the July Complaint is in genuine dispute. In on portion of his testimony, Officer Park indicated that he saw an "open complaint report" on his NYPD work phone. *See* Park Depo 22:9-21; *id.* 23:13-24:5. This testimony is undercut by Officer Park later recollection at the same deposition that he in fact only first saw the July Complaint in the Omniform System once back at the 73rd Precinct, not *before* the arrest. Park Depo 43:24-44:10.

Officer Park's assertion as to viewing the July Complaint is thrown further into dispute because he also testified that what viewed when he said "complaint" was actually an open I-Card. Pl's Reply 56.1 ¶ 34 at Reply; Park Depo at 25:20 ("Yes, the open complaint on you was I-Card"). However, as just explained, this testimony is controverted by other record evidence that an I-Card did not exist. *See* Defendants' 56.1 Counterstatement ¶¶ 49, 68.

Thus, given the conflicting facts as what type of report Officer Park saw on Jeanty and when he saw it, there are material issues of fact exist and credibility determinations that must be

---

[9] "Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *Colon*, 250 F.3d at 135; *see Leibovitz v. Barry*, 15-cv-1722, 2016 WL 5107064, at *9 (E.D.N.Y. Sept. 20, 2016) (dismissing false-arrest claim after finding "the court's assessment as to whether probable cause existed at time of the arrest [ ] to be on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone"); *see also Panetta*, 460 F.3d at 395 ("When making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers. Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful." (cleaned up));

[10] Jeanty also attacks the applicability of the collective knowledge doctrine arguing that "there is no evidence in this matter that anyone with that knowledge was ever in communication with Park" and that "Park was required to speak to someone with direct information about the 'July 2018 Criminal Mischief' complaint." Pl's Memo at 16-19. This argument is misplaced and would turn the purpose of the collective knowledge doctrine on its head. "Under settled law, officers do not need to independently determine that probable cause exists as long as the officer ordering the arrest possesses sufficient probable cause to direct it." *United States v. Esters*, 21-CR-398(EK), 2022 WL 16715891, at *6 (E.D.N.Y. Nov. 4, 2022).

made.  Because such determinations are reserved for a jury, Defendants are not entitled to summary judgment on the basis of having viewed a complaint with sufficient information to establish probable cause.

### c.  Probable Cause Based on Sanders' Reporting

Construing the evidence in the light most favorable of the Defendants and taking all reasonable inferences, a reasonable jury could find that evidence and circumstances presented to Officer Park the day of the arrest amounted to probable cause to arrest Jeanty for criminal mischief in the fourth degree or harassment in the second degree from the July 2018 Incident.  This vitiates Jeanty's motion for summary judgment.

Under New York law,

A person is guilty of criminal mischief in the fourth degree when, having no right to do so nor any reasonable ground to believe that he or she has such right, he or she:

> 1.  Intentionally damages property of another person . . . .
> 2.  Recklessly damages property of another person in an amount exceeding two hundred fifty dollars; . . .

N.Y. Penal L. § 145.00

Further, "A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person" the

> 1.  He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or
> 2.  He or she follows a person in or about a public place or places; or
> 3.  He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.

N.Y. Penal Law § 240(26):

The undisputed facts establish that the Officer Defendants arrived at 230 Lott Ave after receiving Sanders' 911 call.  Subsequently the Officer Defendants learned about the Family Court

25

order and the custody dispute involving NAJ.  Officer Park then went into Sanders' apartment and

Sanders a "brief description" as to what Jeanty had done both day and in prior on July 2018

Incident.  Park Depo 40:18-23.  Officer Park only arrested Jeanty after exiting the apartment.

Though Officer Park did not recall many facts at the time of his deposition, "the district court must

resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of

the party opposing summary judgment[.]"  *McCarthy*, 482 F.3d at 202.  In doing so, the Court

concludes that a reasonable jury could infer that when Sanders gave Officer Park "a brief

description of the [July 2018] incident" in her apartment, her brief description included all the

relevant facts from the July 2018 Incident, including the breaking of her phone.  This inference is

reasonable because other undisputed facts demonstrate that Officer Park  noted "2018 Crim

Mischief" on the September 19 DIR and the audio captured the statement that Sanders explained

that "he [*i.e.*, Jeanty] broke her phone."  Park Depo 40:18-23; Arrest Audio at 1:07:29-39; *see*

N.Y. Penal L. § 145.00(1).  And, as discussed above, there was no reason to discount Sanders'

veracity at the time of the arrest.  *See also Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 245

(E.D.N.Y. 2005) ("It would be unwise for the courts to engage in a hind-sight review to decide

whether a police officer should have credited the story of a person who was willing to swear that

[she] was the victim of a crime.") (citation and quotation marks omitted).

On these undisputed facts, the Court concludes that there was sufficient evidence before

Officer Park such that a reasonable jury could infer there was "fair probability" for Officer Park

to believe that Jeanty had committed criminal mischief during the July 2018 Incident.  *See Esters*,

2022 WL 16715891, at *4 ("Generally speaking, probable cause is a low bar, requiring only a 'fair

probability' that a crime has been or is being committed; it does not mean more likely than not."

(citation omitted)).

26

As a reasonable jury could find probable cause for his arrest based on Sanders' reports to law enforcement, Jeanty's motion for summary judgment on the false arrest claim is **DENIED**.

**5. Defendants' Motion For Summary Judgment**

Defendants argue in their motion for summary judgment that on the undisputed facts in the record there was probable cause for Jeanty's arrest on September 19, 2018.  "Of importance, in a false arrest case where, as here, an arrest is not made pursuant to a judicial warrant,' a defendant 'bears the burden of proving probable cause as an affirmative defense.'" *Jurkowitsch v. City of New York*, 14-CV-6810(PKC)(RML), 2015 WL 8489964, at *5 (E.D.N.Y. Dec. 9, 2015) (quoting *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010)), *aff'd sub nom. Jurkowitsch v. Choudhury*, 673 F. App'x 44 (2d Cir. 2016); *see also Curry v. City of Syracuse,* 316 F.3d 324, 335 (2d Cir. 2003) ("The defendant has the burden of raising and proving the *affirmative defense of probable cause.*") (emphasis added) (internal quotation marks omitted). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers[.]"  *Weyant*, 101 F.3d at 852.

Here, Defendants contend – and it is their burden to prove – that the undisputed facts establish that there was probable cause as a matter of law to arrest Jeanty for both the harassment and criminal mischief charges under New York law as stated in the July 2018 DIR as well as for Jeanty's actions taken towards Sanders on September 19, 2018.  Defendants' Memorandum of Law in Support of Summary Judgment ("Defs' Memo") at 8-11, ECF 61-4.  In the alternative, Defendants argue that they are entitled to qualified immunity because there was "arguable probable cause" to arrest Jeanty.  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).  *See* Defendants' Reply Memo ("Defs' Reply") at 4-6, ECF 61-7.

Now, viewing the facts and taking all inferences in the light most favorable to Jeanty, a reasonable jury could find that Officer Park had no probable cause at the time to arrest him for criminal mischief or harassment under New York law based solely on Sanders' reporting. The facts establish that Sanders was the only undisputed source information as to what happened in July 2018 because there are genuine disputes that Officer Park saw either an I-Card or the July 2018 Complaint prior to arresting Jeanty. Put another way, Officer Park's only source of information is whatever Sanders told him in her apartment.

However, the record shows that Officer Park was unable to recall any specific details of what Sanders told him on September 19, 2018. *See* Park Depo 20:14-16. And, despite Sanders having given Officer Park a "brief description of" the July 2018 Incident and telling Officer Park that "she had previously taken a report out against" Jeanty, Officer Park did not record any of the actual details of Jeanty's conduct into his personal logbook or on the DIR he completed that night. The only facts lefts for the jury as to what happened on July 2, 2018, are the inscription of "July 2018 Criminal mischief" on the DIR report and the audio snippet establishing that Sanders told Park that Jeanty had "broke her phone" back in July 2018. *See* Parts IV.D-F, *supra*. Further, Officer Park admitted that there were no references to the actual July 2018 DIR or pertinent information contained therein noted in his September 19 DIR. *See* Park Depo 40:1-41:8 Additionally, he stated that he did not recall ever seeing a broken phone. *See Id.* 69:17-19. Nor is there any evidence introduced showing whether Office Park knew whether Sanders herself had actually signed the DIR. *See Singer*, 63 F.3d at 119 ("An arresting officer advised of a crime by a person who claims to be the victim, and *who has signed a complaint or information* charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." (emphasis added)).

On these facts, taking all inferences and in favor of Jeanty, a reasonable jury could find that there was insufficient evidence to establish probable that Officer Park knew or was aware of facts amounting to probable cause to arrest Jeanty for criminal mischief because he lacked sufficient knowledge to essential elements of each crime. *Adm'r of U.S. Small Bus. Admin. v. Contessa*, No. 19-CV-6127(PKC)(ST), 2023 WL 2682509, at \*3 (E.D.N.Y. Mar. 29, 2023) (explaining a plaintiff may challenge the legal sufficiency of an affirmative defense and satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case). Specifically, there is a dispute as to the "pertinent events and the knowledge of the officers," *Weyant*, 101 F.3d at 852, such that it would be reasonable for a jury infer that Officer Park did not have sufficient knowledge as of Jeanty's intent to damage Sanders' property or that the property he "recklessly" damaged her phone and that the phone was valued at more than $200.[11]  N.Y. Penal L. § 145.00.

Similarly, there are no facts adduced showing that Sanders told Officer Park about Jeanty grabbing her hair which would suffice element of unwanted contact of harassment in the second degree.  N.Y. Penal Law § 240(26).  Accordingly, because a reasonable jury could find for Jeanty on these facts, Defendants motion for summary judgment as to whether there was probable cause to arrest Jeanty is also **DENIED.**

### 6.  Qualified Immunity On the False Arrest Claim

#### a.  Federal Law

Notwithstanding the dispute as to whether there was actual probable cause for Jeanty's arrest, the Court finds that there was at least "arguable probable cause" for Jeanty's arrest.  Thus,

---

[11] Similarly, no facts were adduced showing Sanders reported Jeanty's grabbing of her hair.  In any event, "under New York law, the offense [of harassment in the second degree[ must occur in the officer's presence to provide probable cause to arrest for second-degree harassment, which is a misdemeanor violation." *Ramos v. City of New York*, 298 F. App'x 84, 86 (2d Cir. 2008) (citing N.Y. Crim. Proc. Law §§ 140.10(1)(a), 140.10(2)). This was not the case here.

Defendants are entitled to qualified immunity under this doctrine. *Escalera*, 361 F.3d at 743 ("Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."). As discussed below, even taking Plaintiff's version of the information available to the police that day as true, and drawing all reasonable inferences in plaintiff's favor, officers of reasonable competence could disagree on whether the probable cause test was met. Thus, qualified immunity is warranted. *See Nash*, 2019 WL 1367159, at *8.

The doctrine of qualified immunity shields government officials from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). That is, qualified immunity is not merely a defense to liability but rather is "an entitlement not to stand trial or face the other burdens of litigation" at all. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

"An arresting officer is entitled to qualified immunity on claims of false arrest and malicious prosecution if either: (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Nash*, 2019 WL 1367159, at *8 (citing *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *accord Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).

The issue of "reasonableness" for purposes of probable cause is distinct from the issue of "reasonableness" for purposes of qualified immunity. *See Kerman v. City of N.Y.*, 374 F.3d 93, 116 (2d Cir. 2004); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("It simply does not

follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [the] search was objectively legally unreasonable."). In *Anderson*, the Supreme Court held that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." 483 U.S. at 641.

The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law.

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) (quotations and citations omitted) (emphasis in original).

Under this standard, "an 'arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *McClellan v. Smith*, 439 F.3d 137, 147-48 (2d Cir. 2006) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

The Court concludes that arguable probable cause existed to arrest Jeanty. Taking the facts and inferences in favor of Jeanty, there is a noted sparsity in the record as to how much Sanders told Officer Park about what happened during the July 2, 2018, incident. *See supra* Part B.5. Nonetheless, it is undisputed that on September 19, 2018, Officers Park and Viruet were called to 230 Lott Ave in response to a 911 harassment report; when they arrived they became aware of an

ongoing custody battle between Jeanty and Sanders; Officer Park entered Sanders' apartment and talked with her and Sanders filled out a DIR; Sanders made Officer Park aware of a prior domestic incident between Jeanty and Sanders occurring in July 2018, in which her phone was broken, and that resulted in Sanders filing a criminal complaint against Jeanty alleging criminal mischief, as evidenced in September 2019 DIR.

Probable cause deals in "fair probabilities" – less than preponderance of the evidence. *United States v. Juwa,* 508 F.3d 694, 701 (2d Cir.2007) ("Probable cause is a lower standard than preponderance of the evidence."); *cf. Illinois v. Gates,* 462 U.S. 213, 243 n. 13 ( "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity. By hypothesis, therefore, innocent behavior frequently will provide the basis for a showing of probable cause[.]").  The Court finds that a hypothetical reasonable officer placed in the same situation as Officer Park may have equally believed probable cause existed to arrest Jeanty,  or, that at a minimum, the reasonable officer "could disagree on whether the probable cause test was met." *Walcyk*, 496 F.3d at 163

The Court also acknowledges that the Jeanty's arrest arose in the context of a reoccurring domestic dispute, where the training and experience of reasonable officers might be tested and diverge.  As other courts have noted, reasonable officers responding to domestic disputes often find themselves in "difficult position" involving  situations "where stories conflicts and recantations happen [] frequently[.]" *Torres v. City of New York*, 20-CV-4007 (BMC), 2022 WL 955152, at *5 (E.D.N.Y. Mar. 30, 2022).  "The law does not charge the officers with sorting out the different versions of events" but rather requires them to be reasonable and rely on training and experience to respond in fluid and changing circumstances.  *Id.*  Thus, the law grants qualified immunity to all law enforcement acting under color of law except the "plainly incompetent or

those who knowingly violate the law[.]" *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) (cleaned up).  Because the record does not reflect that Officer Park or Viruet knowingly were violating the law or were plainly incompetent in responding the 911 call and subsequently arresting Jeanty, the Court grants summary judgment to the Defendants on the issue of qualified immunity. As such, Jeanty's false arrest claims must be dismissed.[12]

## C.    Malicious Prosecution Claims

In order to prevail on a claim for malicious prosecution, a plaintiff must demonstrate that: (1) the defendant initiated or continued a criminal proceeding; (2) the proceeding terminated in plaintiff's favor; (3) there was an absence of probable cause for the proceeding; (4) the defendant was motivated by actual malice; and (5) there was a post-arraignment deprivation of liberty. *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).  "The existence of probable cause is a complete defense to a claim of malicious prosecution."  *Delamota v. City of New York*, 683 Fed. App'x. 65, 66 (2d Cir. 2017).  "The elements of a malicious prosecution claim brought under § 1983 are substantially the same as in malicious prosecution claims brought under New York law." *Jackson v. City of New York*, 939 F. Supp. 2d 235, 250 (E.D.N.Y. 2013) (citing *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir.1984)).

Plaintiff plainly meets the first two elements of a malicious prosecution claim: (1) a criminal proceeding was initiated and continued against him; and (2) the proceedings ultimately terminated in his favor. The parties' dispute centers on whether there was probable cause to prosecute the plaintiff and whether Defendants were motivated by "actual malice."

---

[12] As the Court has already dismissed Plaintiff's state law claims of false arrest as time barred, *see supra* Part A, "it is unnecessary for the Court to address the arresting officers' qualified immunity argument" under state law.  *Namara v. City of New York*, 06 CIV 5585(LTS)(FM), 2009 WL 735135, at *7 (S.D.N.Y. Mar. 20, 2009).

"The probable cause determination relevant to a malicious prosecution claim differs slightly from that relevant to a false arrest claim." *Smith v. City of New York*, 1:18-CV-05079(MKV), 2021 WL 4267525, at \*11 (S.D.N.Y. Sept. 20, 2021) (citations omitted); *see Posr*, 180 F.3d at 417. "In the malicious prosecution context, probable cause is defined as 'the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of.'" *Diop v. City of New York*, 50 F. Supp. 3d 411, 421 (S.D.N.Y. 2014) (quoting *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994)). Unlike an arrest, prosecution requires probable cause for each of the crimes charged. *See Posr v. Doherty*, 944 F.2d 91, 100 (2d Cir. 1991).

Importantly, probable cause to prosecute "is assessed in light of the facts known or reasonably believed *at the time the prosecution was initiated*, as opposed to at the time of the arrest." *Sankar v. City of New York*, 867 F. Supp. 2d 297, 311 (E.D.N.Y. 2012) (quoting *Carson v. Lewis*, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999)) (emphasis added). Therefore, "information discovered by a malicious prosecution defendant after the arrest, but before the commencement of proceedings, is relevant to the determination of probable cause in cases where the prosecution follows a warrantless arrest." *Jackson,* 939 F. Supp. 2d at 251 (citation and quotation marks omitted). A police officer is entitled to qualified immunity on a malicious prosecution claim if there was arguable probable cause to support prosecution. *See, e.g.*, *Betts v. Shearman*, 751 F.3d 78, 82–83 (2d Cir. 2014); *Jean v. Montina*, 412 F. App'x 352, 354–55 (2d Cir. 2011) (summary order).

On September 20, 2018, Jeanty was arraigned on the following criminal charges brought by the Kings County District Attorney[13]: harassment in the second degree under N.Y. Penal Law § 240.23(01), criminal mischief under N.Y. Penal Law § 145.00(01), menacing under N.Y. Penal Law § 120.15, and unauthorized use of a vehicle under N.Y. Penal Law § 165.05(01). See Defs' 56.1 Reply ¶ 23.  The affidavit supporting the state court criminal complaint was sworn by Officer Park.  Officer Park's Crim. Court. Aff., Ex. N. to Defs' Decl., ECF 61-22.

A crucial and undisputed fact for this analysis is that Officer Park testified that at some point after his return to the 73rd Precinct he reviewed the July Complaint.  *See* Park Depo 29:8-12.  The Court finds that, even construing the facts and inferences in the light most favorable to Jeanty, there was sufficient information contained in the July 2018 Complaint, taken along with Officer Parks' conversation with Sanders, to establish probable cause or at least arguable probable for each of the charged offenses.  *See* July 2018 Complaint.

As to criminal mischief, the July 2018 Complaint reflects that the damage accrued to Sanders' phone was less than $250, eliminating a charge under N.Y. Penal Law §145.(3).  *Id.* However, the July Complaint does state that "Perp did recklessly cause her phone to be damaged by dropping it" and that Sanders had been "arguing with" Jeanty prior to the incident.  Taken with the undisputed fact that Sanders told Officer Park that Jeanty broke her phone, this is sufficient to establish arguable probable cause in that it is objectively reasonable to believe that Jeanty intentionally caused damage to Sanders phone during an argument and thus a lawful ground to prosecute him for it.

---

[13] Because the evidence on summary judgment does not show that any other defendants played a role in plaintiff's prosecutions, the malicious prosecution claims will only be evaluated with respect to Officer Park.  *See Cornett*, 2006 WL 845568, at *14.

Turning to the second degree harassment charge, the July 2018 Complaint establishes that Jeanty "did pull [Sanders'] hair and cursed at her, causing [Sanders] to be annoyed alarmed and fear for her safety."   July 2018 Complaint; *see also* Defs' Reply ¶ 56.1 (Jeanty not disputing grabbing Sanders' hair as reported in the July 2018 DIR).  This suffices probable cause because Jeanty "str[u]ck . . . or otherwise subject[ed] such other person to physical contact" with no other legitimate purpose than an "intent to harass, annoy or alarm."  N.Y. Penal L. § 240.26

These same facts are also sufficient to establish probable cause for the menacing charge. "A person is guilty of menacing in the third degree when, by physical menace, he or she intentionally places or attempts to place another person in fear of death, imminent serious physical injury or physical injury."  N.Y. Penal Law § 120.15.  Again, Jeanty here indeed placed Sanders in actual imminent fear or of imminent serious physical injury by following her, getting out of his car, entering her car, and grabbing her hair.  *Cf. People v. Maier*, 140 A.D.3d 1603, 1604, 34 N.Y.S.3d 544, 546 (Fourth Dep't 2016) ("[T]he People established that defendant intended to commit at least . . . menacing in the third degree[]—as demonstrated by the facts that defendant was armed with a knife when he entered the residence through a window, threatened to eject the victim from the residence, and immediately lunged at the victim from the windowsill, initiating a fight in which defendant punched the victim and tore out a handful of the victim's hair.").

Lastly, one commits the offense of an unauthorized use of a vehicle in the third degree when "knowing that he does not have the consent of the owner, he takes, operates, exercises control over, rides in or otherwise uses a vehicle."  N.Y. Penal Law § 165.05(01).  "The scope of the offense is not limited to circumstances in which the vehicle is operable or moving.  It also applies to a person who enters an automobile without permission and takes actions that interfere with or are detrimental to the owner's possession or use of the vehicle."  *People v. Bajas*, 61 Misc. 3d 20,

22, 83 N.Y.S.3d 393 (N.Y. App. Term. 2018) (citing *People v Franov*, 17 NY3d 58, 63 (N.Y. 2011)) (quotation marks omitted).   The situation here presents is a close case because such unauthorized use cases generally require some sort of control or dominion over the *vehicle*, not the occupant.[14]   However, the Court concludes that there was at least arguable probable cause to believe that Jeanty's actions of getting into a physical altercation with Sanders inside of her car could suffice as interfering with Sanders' property rights in being able to "use" her vehicle or set it in motion as she wished.   Because "the evidence permits a reasonable belief that a prosecution against the defendant 'could succeed,' [the] malicious prosecution claim cannot survive summary judgment."  *Greene v. City of New York*, 08-CV-00243(AMD)(CLP), 2017 WL 1030707, at *21 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018).   Thus Officer Park is granted qualified immunity as to this charge.

As probable cause or arguable probable cause was present for each crime charged on September 20, 2019, the Court grants summary judgment to the Defendants and Jeanty's malicious prosecution claims are dismissed.

**D.     Claims Against New York City**

Jeanty moves to hold the City "vicariously liable" for the federal and state false arrest and malicious prosecution claims.  Pl's Memo at 25.  Given his pro se status, the Court construes this liberally to allege a municipal liability claim against the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for alleged deprivations of his constitutional rights and a state law tort claim of negligent training and negligent supervision claim against the City under New York State law.

---

[14] *See, e.g.*, *People v. Velez*, 149 Misc. 2d 592, 593, 565 N.Y.S.2d 950, 951 (Crim. Ct. 1990) ("Mere occupation of another's vehicle does not amount to taking, operating, exercising control over or otherwise using the vehicle as contemplated by the statutory language."); *People v. Murray*, 143 Misc. 2d 509, 511, 541 N.Y.S.2d 331, 333 (Crim. Ct. 1989) (explaining the New York caselaw on the issue requires an unauthorized "occupation" of a vehicle coupled with "exercise of at least some degree of control over the vehicle as manifested by the defendants' *present ability to set the vehicle in motion*.") (emphasis added).

1. **The *Monell* Claim**

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), "[m]unicipalities may be sued directly under Section 1983 for constitutional deprivations imposed upon the plaintiff pursuant to a "governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a *respondeat superior* basis for the tort of its employee." *Id.* Thus, "to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

Here Jeanty fails to cite to any evidence and provide more than conclusory argument that "[t]he City of New York is vicariously liable for the Federal and State false arrest and malicious prosecution claims." Pl's Memo at 25. Here, the record is devoid of any facts is as to a custom, policy, or training, much less a disputed issue of fact requiring a jury. Thus, no reasonable jury could identify a NYPD custom or policy followed by the Defendant Officers much less a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of Okla. v. Tuttle*, 471 U.S. 808, n. 8 (1985) (plurality opinion) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must at least be an affirmative link between [,for example,] the training inadequacies alleged, and the particular constitutional violation at issue."). Accordingly, Jeanty's *Monell* claim against the City is dismissed**.**

### 2. New York State Negligent Hiring and Negligent Supervision

"New York law precludes a claim for negligent training or negligent supervision against an employer for acts taken within the scope of the employee's employment." *Salamone v. United States*, 618 F. Supp. 3d 146, 153 (S.D.N.Y. 2022) (citing *Velez v. City of New York*, 730 F.3d 128, 136-37 (2d Cir. 2013)); *Hamilton v. City of New York*, 15-cv-4574, 2019 WL 1452013, at *31 (E.D.N.Y. Mar. 19, 2019). "[N]egligent training and supervision claims are precluded if the individual defendants acted within the scope of their employment." *Id.* The record makes plain that the Officer Defendants were on duty and responding to 911 call when they arrived at 230 Lott Ave, interviewed Sanders, and subsequently arrested him. Jeanty presents no facts to controvert this or raise a genuine issue of fact showing that the Officer Defendants were acting outside the scope of their employment. Accordingly the negligent hiring and supervision claim is dismissed.

CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is **DENIED** in its entirety. Defendants' motion for summary judgment is **GRANTED** in its entirety as to the issues of qualified immunity for false arrest, malicious prosecution, and all claims against the City. Lastly, upon Plaintiff's concession that his claim under NYC Administrative Code Chap. 8 Sec 8-803, must be dismissed, the Court orders the same. As there are no remaining viable claims, Plaintiff's action is **DISMISSED**.

**SO ORDERED.**

/s/Orelia E. Merchant
ORELIA E. MERCHANT
United States District Judge

Dated:        August 16, 2024
              Brooklyn, New York